UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, </br></br> Plaintiff, </br></br> v. </br></br> CARLO G. CHIASE and C.G.C. ADVISORS, LLC, </br></br> Defendants, </br></br> and </br></br> MICOL CHIAESE, </br></br> Relief Defendant. | 10-CV-5110 </br></br> OPINION |

This matter comes before the Court on the Securities and Exchange Commission's (the "SEC") motion for summary judgment under Federal Rule of Civil Procedure 56 as to Relief Defendant Micol Chiaese. Micol Chiaese has not filed any opposition or response. For the reasons discussed below, the Court will grant summary judgment against her.

**I.    Factual and Procedural Background**[1]

A. Procedural History

From 2008 until 2010, defendant Carlo Chiaese ("Chiaese"), a registered investment advisor, defrauded numerous clients by falsely representing to them

---

[1] The Court draws these facts from the record and the SEC's Local Civil Rule 56.1 statement of undisputed material facts; because Micol Chiaese has not filed any opposition, the Court deems these facts to be undisputed. *See* L. Civ. R. 56.1(a). ("[A]ny material fact not disputed shall be deemed undisputed for the purposes of the summary judgment motion.").

1

that he was investing their money in various securities, including bonds and mutual funds, while he was, in fact, misappropriating those funds for his own benefit. On October 4, 2010, the FBI filed a criminal complaint against Chiaese, resulting in the commencement of criminal proceedings against him (the "parallel criminal action."). Chiaese was charged with violating Section 17(a) of the Securities Act of 1933, Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5, and Section 206(1) and 206(2) of the Investment Advisers Act of 1940. October 5, 2010, the SEC filed the present action – a civil complaint against Chiaese, Defendant C.G.C. Advisors, LLC ("CGC"),[2] of which Chiaese is the principal member, and Relief Defendant Micol Chiaese, Chiaese's wife.[3] On October 11, 2010, Micol Chiaese signed a declaration asserting her Fifth Amendment right and refusing to participate in a deposition. And on October 12, 2010, in her Answer, Micol Chiaese continued to assert her Fifth Amendment right against self-incrimination with respect to the specific allegations contained in the Complaint that apply to her. On December 17, 2010, this Court stayed this action until resolution of the parallel criminal action.

On January 14, 2011, in the parallel criminal action, Chiaese signed a plea agreement with the United States Attorney for the District of New Jersey in which he agreed to plead guilty to violating 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. Rule 240.10b-5. Chiaese entered a guilty plea before this Court on March 31, 2011. And on August 18, 2011, this Court entered a criminal judgment against Chiaese ordering fifty-eight months imprisonment and payment of $2,464,518 in restitution.

After resolution of the parallel criminal action, counsel for Micol Chiaese informed the SEC that Micol Chiaese continues to stand by her assertion of the Fifth Amendment and refuses to appear for a deposition in this action.[4] The SEC now moves for summary judgment against her and for an order disgorging $289,300, plus prejudgment interest.

This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Sections 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(e) and 78aa, and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14.

### B. History of Chiaese's Fraud

Between June 1994 and February 2008, Chiaese worked as a registered representative for numerous broker-dealers, and between February 2008 and June

---

[2] CGC is a New York limited liability corporation located in Westfield, New Jersey and New York, New York.
[3] Micol Chiaese is a resident of Chester, New Jersey.
[4] CGC consented to judgment against it on November 3, 2011.

28, 2010, Chiaese was associated with Investors Capital Corp. ("ICC"). While associated with ICC, Chiaese continued to conduct securities business in the name of CGC.

In approximately November 2008, a union pension trust fund for Local 333 United Marine Division (the "Union Fund") became an advisory client of Chiaese. At this time, Chiaese told the Union Fund trustees that he would invest the Union Fund's money conservatively in bonds and mutual funds. On November 25, 2008, the Union Fund caused $1,715,241.30 to be wire transferred to the HSBC bank account. Instead of purchasing bonds and mutual funds for the Union Fund, Chiaese and CGC misappropriated the funds and used the funds for their own benefit. The judgment in the criminal action demonstrates that the Union Fund was a victim of the securities fraud committed by Chiaese in the amount of approximately $1.5 million.

Antonio and Deborah Pavan were clients of Chiaese since approximately 2002. Between February 2008 and March 2010, the Pavans provided Chiaese with a total of $471,390.96 in checks payable to CGC. Based on Chiaese's representations to them, they believed these funds were invested in CDs and mutual funds held in their joint account at ICC. But according to ICC, the Pavans never had a joint account with ICC. Instead, the evidence shows that Chiaese and CGC misappropriated these funds and used them for their own benefit. The Pavans were unable to reclaim any money from the defendants despite repeated efforts.

In 2005, Antonio Pavan introduced Chiaese to Ennio Ranaboldo, a friend of his. Shortly thereafter, Ranaboldo became an advisory client of Chiaese. Between February 1, 2008 and April 2010, Ranaboldo issued approximately $135,000 worth of checks payable to CGC for investments in certain bonds that Chiaese represented he would purchase through ICC. Thereafter, Chiaese assured Ranaboldo that the bonds had been purchased and were safe and provided him with fabricated account statements and confirmations showing that the bonds had been purchased. According to ICC, Ranaboldo was not a customer, and it never held any investments for him. Instead, Chiaese and CGC misappropriated these funds and used them for their own benefit.

Around or before 2007, Anthony Del Gaizo, MD, became an advisory client of Chiaese. From the summer of 2009 until approximately May 2010, Chiaese convinced Dr. Del Gaizo to invest approximately $270,000. Dr. Del Gaizo furnished these funds via checks and wire transfers, and the funds were deposited into the HSBC bank account. When Dr. Del Gaizo later called ICC to confirm his investments, he was told that he did not have an account with ICC. Dr. Del Gaizo then called Chiaese to request that all his accounts be liquidated and the funds returned to him. On June 22, 2010, Chiaese met with Dr. Del Gaizo at his office in Belleville, New Jersey, and handed him an HSBC check for $284,000 payable

from CGC. On June 28, 2010, Dr. Del Gaizo deposited the $284,000 check. He later received notice that the check had bounced. When Dr. Del Gaizo called Chiaese to ask what happened, Chiaese stated that he needed more time to gather the funds. His further attempts to contact Chiaese proved fruitless.

### C. Micol Chiaese's Involvement

Although she was not charged in the parallel criminal proceedings, the SEC argues that Micol Chiaese received a portion of the improperly attained funds without having any legitimate claim to the money. Between August 2007 and October 2008, Chiaese, CGC, and Micol Chiaese maintained a Citibank account in CGC's name. Between November 2008 and July 2010, Chiaese, CGC, and Micol Chiaese maintained an HSBC bank account and money market account in CGC's name. Micol Chiaese was purportedly an officer of CGC, serving as President and/or Vice President, and certain CGC bank account records identify Micol Chiaese as CGC's President or Vice President. Along with her husband, Micol Chiaese had signatory authority on the HSBC bank accounts. Micol Chiaese wrote checks to herself and withdrew money for her own benefit from CGC's HSBC bank account. Between February 2008 and October 2008, CGC transferred $28,000 from CGC's Citibank bank account number 759191957 to Micol Chiaese. And between November 2008 and June 2010, CGC transferred at least $261,300 to Micol Chiaese from CGC's HSBC bank account number 407-01152-8. In total, Micol Chiaese received approximately $289,300 from CGC's HSBC and Citibank accounts between February 2008 and June 2010, while Chiaese was defrauding his clients. Despite her nominal title, there is no evidence on the record suggesting that Micol Chiaese actually performed any services for CGC that would have entitled her to receive any of these payments.

## II.   Legal Analysis

### A. Motion for Summary Judgment Standard

Summary judgment is appropriate "if the pleadings, the discovery, and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). A factual dispute is genuine if a reasonable jury could find for the non-moving party, and is material if it will affect the outcome of the trial under governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court

considers all evidence and inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.2d 641, 647 (3d Cir. 2007). Where there are no genuine issues of material fact, the Court may properly resolve any remaining questions of law on summary judgment. *See, e.g.*, *Ingram v. County of Bucks*, 144 F.3d 265, 267 (3d Cir. 1998).

### B. Disgorgement

Courts have the authority to order disgorgement of ill-gotten gains in an SEC enforcement action. *See SEC v. Hughes Capital Corp.*, 124 F.3d 449, 455 (3d Cir. 1997); *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C.Cir. 1989); *SEC v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987). Disgorgement is an equitable remedy by nature, and the district court is therefore invested with broad discretion in fashioning an appropriate disgorgement order. *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1085 (D.N.J. 1996), *aff'd*, 124 F.3d 449 (3d Cir. 1997). While "'disgorgement need only be a reasonable approximation of profits causally connected to the violation,'" *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir.1995) (quoting *First City Fin.*, 890 F.2d at 1231), it may not be ordered as a punitive measure. *Hughes Capital*, 917 F.Supp. at 1085. Disgorgement may be appropriate against certain parties even though there is no evidence that the parties either participated in or were aware of the fraud. *See SEC v. Antar*, 15 F. Supp. 2d 477, 532-33 (D.N.J. 1998) (ordering full disgorgement of profits of fraud from relief defendants). The touchstone is whether the party from which the SEC seeks disgorgement has any legitimate claim to the money. *Id.* at 533; *see also SEC v. Cavanuagh*, 155 F.3d 129, 136 (2d Cir. 1998) ("Federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds.").

The SEC bears the initial burden of establishing that a fraud occurred, that Micol Chiaese received funds from that fraud, and that she had no legitimate claim to those funds. Once that is established, the SEC also bears the initial burden of establishing that the disgorgement figure is a reasonable approximation of the unlawful profits. *Hughes Capital*, 917 F. Supp. at 1085.

### i. The Primary Fraud

Here, there is no question that Chiaese – and CGC – committed violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. To establish violations of Section 10(b) and Rule 10b-5,

5

the SEC must show that the Defendants: (1) made a material misrepresentation or a material omission as to which they had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997); *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999); *SEC v. Saltzman*, 127 F. Supp. 2d 660, 665 (E.D. Pa. 2000). Section 17(a)(1)-(3) requires a showing of the same elements, except that the statement may be made in connection with the offer or sale of a security, and no showing of scienter is required for the SEC to obtain an injunction under subsections (a)(2) or (a)(3). *Monarch Funding*, 192 F.3d at 308; *Saltzman*, 127 F. Supp. 2d at 665 & n.5. As outlined in the facts above, Chiaese, while operating through CGC, made numerous misrepresentations to investors in connection with the offer and sale of securities: he received funds with the pretense that he would invest those funds and then turned around and misappropriated them for his own use. On some occasions, he even furnished his defrauded clients with falsified records of their nonexistent investments. These statements and omissions were material as a matter of law because any investor would obviously want to know that his financial adviser was misappropriating the investor's funds. *See S.E.C. v. Pasternak*, 561 F. Supp. 2d 459, 498 (D.N.J. 2008) (test for materiality is whether "'there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.'") (quoting *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 200 (3d Cir. 1990)); *see also SEC v. Research Automation Corp.*, 585 F.2d 31, 35-36 (2d Cir. 1978) (holding that finding of materiality is appropriate at summary judgment stage and affirming district court's finding that omissions were material because "[w]hat reasonable investor would not wish to know that the money raised by stock sales would not be used for working capital but [would] be diverted to [defendant's] officers?"). And, as Chiaese has admitted, he took these actions with the intent to defraud.

   Similarly, there is no question that Chiaese and CGC violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940, 15 U.S.C.§§ 80b-6(1), (2)). Sections 206(1) and 206(2) prohibit fraudulent conduct by investment advisers and impose a fiduciary duty on investment advisers. That duty requires an adviser to act in good faith, to disclose fully and fairly all material facts to its clients, and to employ reasonable care to avoid misleading its clients. *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194-95 (1963). That is, investment advisers must act for the benefit of their clients and must not use their clients' assets to benefit themselves. *See SEC v. Moran*, 922 F. Supp. 867, 895-96 (S.D.N.Y. 1996). Scienter is necessary to violate Section 206(1) of the Advisers Act, but is not required to prove violations of Section 206(2). *Steadman v. SEC*,

603 F.2d 1126, 1134 (5th Cir. 1979), *aff'd on other grounds*, 450 U.S. 91 (1981) (*citing Capital Gains*, 375 U.S. at 195). Here, in violation of Sections 206(1) and 206(2), CGC and Chiaese breached their fiduciary duties to their clients and engaged in fraudulent activity by, among other things, lying to their clients and intentionally misappropriating over $2.5 million.

### ii. Micol Chiaese's Receipt of Ill-Gotten Funds

The undisputed facts show that Micol Chiaese received approximately $289,300 in ill-gotten funds to which she had no legitimate claim. Chiaese deposited misappropriated funds in banks accounts to which Micol Chiaese had access. The SEC has provided evidence, including bank records and cancelled checks, establishing that from February 2008 until June 2010 – while Chiaese was perpetrating the primary fraud – Micol Chiaese received approximately $289,300 from those accounts. Indeed some occasions she appears to have withdrawn the funds herself or otherwise used her authority to transfer money from the accounts to herself. The Court is aware of no evidence to the contrary, and the Court is aware of no evidence to suggest that Micol Chiaese had any legitimate claim to these funds.[5] And based on the record evidence, the amount of $289,300 appears to be a reasonable approximation of the share of the unlawful profits that Micol Chiaese received.

### C. Prejudgment Interest

In a securities fraud actions brought by the SEC, courts have discretion to order relief defendants to pay prejudgment interest on money they are ordered to disgorge. *See, e.g.*, *SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1089 (D.N.J. 1996). In determining whether to make such an award, the Court must consider "both compensation and fairness." *Id.*

Here, the SEC has requested an award of prejudgment interest, at the Internal Revenue Service underpayment rate, *see* 26 U.S.C. § 6621(a)(2), on the entire sum of $289,300 from the period of July 1, 2010 until the entry of

---

[5] These facts are undisputed in large part because Micol Chiaese has elected to assert her Fifth Amendment right against self-incrimination rather than cooperate. While the Court should take no action making the invocation of that right too "costly", the Court may, in a civil action such as this, draw an adverse inference against the party claiming its benefits. *See, e.g.*, *SEC v. Graystone Nash, Inc.*, 25 F.3d 187, 190 (3d Cir. 1994). As such, this Court could reasonably infer from Micol Chiaese's invocation of her Fifth Amendment right that she received the funds and that she had no legitimate claim to them. And though the SEC urges the Court to draw such an inference, it is not necessary. Here, the SEC has put forth sufficient evidence to prove its claims and its right to disgorgement. Micol Chiaese has offered no evidence, and so she has failed to establish that there are any genuine issues of material fact barring summary judgment on these issues.

judgment.[6] Here, an award of prejudgment interest at this modest rate is appropriate – the victims were deprived of their funds since well before July 1, 2010, and had they had access to them, they would have likely realized some benefit from that. Therefore, considerations of equity compel this Court to award an additional $15,560.34 in prejudgment interest.[7]

### III.     Conclusion

   For the reasons stated above, the Court will grant summary judgment against Relief Defendant Micol Chiaese and will order disgorgement against her in the amount of $304,860.34, inclusive of prejudgment interest. An appropriate order follows.


                                                   /s/ William J. Martini
                                         **WILLIAM J. MARTINI, U.S.D.J.**

---

[6] According to the SEC's briefing, the underpayment rate has fluctuated between 3 and 4% for the entire period of July 1, 2010 through November 30, 2011. (SEC's Br. Supp. Summ. J. 9.) Courts have awarded prejudgment interest calculated using the underpayment rate in other enforcement actions. *See, e.g.*, *Hughes*, 917 F. Supp. 2d at 1090; *SEC v. Teo*, No. 04-1815, 2011 WL 4074085, at *7 (D.N.J. Sept. 12, 2011).

[7] This represents an award of prejudgment interest on the entire amount of disgorgement calculated from July 1, 2010 until November 30, 2011 at the underpayment rate. (SEC's Br. Supp. Summ. J. 9.)